1

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
ANDREW C. HAMILTON (299877)
*andrew@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:    (619) 798-2006
Facsimile:    (313) 293-7071

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARJEL MCFADDIN and MARK BEASELY, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
| v. | **CAL. BUS. & PROF. CODE §§17200** *et seq.***;** |
| CONAGRA BRANDS, INC., | **CAL. BUS. & PROF. CODE §§17500** *et seq.***;** |
| Defendant. | **CAL. CIV. CODE §§ 1750** *et seq.***; and** |
| | **BREACH OF EXPRESS WARRANTIES** |
| | **DEMAND FOR JURY TRIAL** |

1

1

**TABLE OF CONTENTS**

I.    JURISDICTION AND VENUE ........................................................................ 1

II.   INTRADISTRICT ASSIGNMENT.................................................................. 1

III.  NATURE OF THE ACTION .......................................................................... 1

IV.   PARTIES ...................................................................................................... 2

V.    NATURE OF TRANS FAT............................................................................ 3

      A.    There is a Scientific Consensus That Trans Fat is Extremely Harmful ...............4

      B.    The Artificial Trans Fat in Fleischmann's Causes Cardiovascular Disease ......................6

      C.    The Artificial Trans Fat in Fleischmann's Causes Type-2 Diabetes ..................................8

      D.    The Artificial Trans Fat in Fleischmann's Causes Breast, Prostate, and Colorectal
            Cancer .............................................................................................9

      E.    The Artificial Trans Fat in Fleischmann's Causes Alzheimer's Disease and
            Cognitive Decline ......................................................................10

      F.    The Artificial Trans Fat in Fleischmann's Causes Organ Damage ......................11

VI.   PLAINTIFFS' PURCHASES OF FLEISCHMANN'S......................................... 13

VII.  SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, .......................... 14

AND DECEPTIVE ACTS ..................................................................................... 14

VIII. FLEISCHMANN'S UNLAWFULLY OMITTED ITS ARTIFICIAL FLAVOR........................ 19

IX.   FLEISCHMANN'S UNNECESSARILY CONTAINED PHO AND ARTIFICIAL
      TRANS FAT ................................................................................................ 20

X.    DEFENDANT'S PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE
      CALIFORNIA UNFAIR COMPETITION LAW ............................................... 20

XI.   DEFENDANT'S PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING OF
      THE CALIFORNIA UNFAIR COMPETITION LAW ....................................... 21

XII.  RELIANCE AND INJURY ............................................................................ 22

XIII. DELAYED DISCOVERY .............................................................................. 23

XIV.  CLASS ACTION ALLEGATIONS ................................................................. 24

XV.   CAUSES OF ACTION.................................................................................. 27

XVI.  PRAYER FOR RELIEF ................................................................................ 36

XVII. JURY DEMAND .......................................................................................... 37

XVIII. APPENDIX A: COMPETING TRANS FAT FREE PRODUCTS ............................. 38

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs Marjel McFaddin and Mark Beasley (collectively "Plaintiffs"), on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, hereby sue Defendant ConAgra Brands, Inc. ("ConAgra" or "Defendant"), and upon information and belief and investigation of counsel, allege as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and because more than two-thirds of the members of the class defined herein reside in states other than the state of which ConAgra resides.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff Mark Beasley resides in and suffered injuries as a result of ConAgra's acts in this District many of the acts and transactions giving rise to this action occurred in this District and ConAgra: (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets of this District through the distribution and sale of its products in this District; and (2) is subject to personal jurisdiction in this District.

## II.    INTRADISTRICT ASSIGNMENT

3.    This civil action arises in part out of the acts and omissions of Defendant ConAgra Brands, Inc., which occurred in San Francisco County, California. Pursuant to Civil Local Rule 3-2(c), this action should be assigned to the San Francisco or the Oakland Division. There is a related putative class action pending in the San Francisco Division (*Backus v. ConAgra Brands, Inc.*, Case No. 3:16-454-WHA).

## III.    NATURE OF THE ACTION

4.    During the Class Period, ConAgra manufactured, marketed, distributed, and sold a large variety of margarine and vegetable oil spread products under the brand name Fleischmann's containing partially hydrogenated oil (collectively the "Products").

5.    PHO is a food additive banned in the United States and many other parts of the world due to its artificial trans fat content.

6.      Artificial trans fat is a toxin and carcinogen for which there are many safe and commercially viable substitutes.

7.      ConAgra used various marketing methods to falsely represent Fleischmann's as healthful and not harmful to the cardiovascular system, but Fleischmann's contained dangerous levels of PHO, and thus trans fat.

8.      On June 17, 2015, the FDA determined that PHO is unsafe for use in food. *See* 80 Fed. Reg. 34650 (June 17, 2015) (hereinafter "FDA Final PHO Determination"). Yet ConAgra continued to incorporate this illegal, dangerous additive into Fleischmann's, even after the FDA tentatively, and then finally, declared it unsafe for use in food, rendering products made with PHO unlawful and adulterated.

9.      Although safe, low-cost, and commercially acceptable alternatives to PHO exist, including those used in competing brands and even in other ConAgra products, ConAgra unfairly elected *not* to use these safe alternatives in Fleischmann's in order to increase profit at the expense of the health of consumers.

10.     Fleischmann's labeling further violates specific FDA regulations, as described in detail herein.

11.     Additionally, ConAgra misleadingly markets Fleischmann's with health claims. This false advertising deceived consumers into purchasing a product that is harmful to their health.

12.     Plaintiffs repeatedly purchased and consumed Fleischmann's during the Class Period defined herein.

13.     This action is brought to remedy ConAgra's unfair, deceptive, immoral and unlawful conduct. On behalf of the class defined herein, Plaintiffs seek an order compelling ConAgra to, *inter alia*: (1) destroy all misleading and deceptive materials and products; (2) forever refrain from using artificial trans fat as an ingredient in Fleischmann's; (3) award Plaintiffs and the Class restitution; and (4) pay costs, expenses, and reasonable attorney fees.

## IV.    **PARTIES**

14.     Defendant ConAgra is a Delaware corporation with its principal place of business in Chicago, Illinois.

CLASS ACTION COMPLAINT

15.     Plaintiff Marjel McFaddin is a resident of Los Angeles County, California who repeatedly purchased Fleischmann's for personal and household consumption.

16.     Plaintiff Mark Beasley is a resident of San Francisco County, California who repeatedly purchased Fleischmann's for personal and household consumption.

## V.     NATURE OF TRANS FAT

17.     Artificial trans fat is a toxic, unlawful food additive manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400°F in the presence of ion donor catalyst metals such as rhodium, ruthenium, and nickel.[1] The resulting product is known as partially hydrogenated oil, or PHO, and it is used in dangerous quantities in Fleischmann's.

18.     PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann. Artificial trans fat molecules differ chemically from the natural fat molecules in other food products.[2]

19.     Natural fat, except the trace amounts of natural trans fat from ruminant animal sources like beef, milk, and mutton, comes in two varieties: (1) fats that lack carbon double bonds ("saturated fat") and (2) fats that have carbon double bonds with contiguous hydrogen atoms ("cis fat"). Trans fat, in contrast to cis fat, has carbon double bonds with hydrogen atoms on opposite sides of the carbon chain.



---

[1] *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[2] *See* Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). *See also* Walter Willett, *The Scientific Case for Banning Tran s Fats*, Scientific American, *available at* www.scientificamerican.com/article/the-scientific-case-for-banning-trans-fats/ (last visited January 24, 2017).

20.    PHO is attractive to the processed food industry because it combines the very low cost of unsaturated cis fat with the "mouth feel" and long shelf life of saturated fat. PHO is manufactured from inexpensive oilseed,[3] while the saturated fat it replaces in processed food is derived from relatively expensive animal and tropical plant sources.[4] Given its versatility, ten years ago PHO was used in 40% of processed packaged foods.[5] Now that its toxic properties are known, few food companies continue to use PHO. ConAgra, however, has decided not to follow its more responsible peers and cease using PHO during the Class Period, instead unfairly placing its profits over public health.

**A.    There is a Scientific Consensus That Trans Fat is Extremely Harmful**

21.    PHO causes cardiovascular heart disease, diabetes, cancer, and Alzheimer's disease, and accelerates memory damage and cognitive decline.

22.    There is "no safe level" of PHO or artificial trans fat intake.[6]

23.    In addition, "trans fatty acids are not essential and provide no known benefit to human health."[7] Thus, while "the [Institute of Medicine] sets tolerable upper intake levels (UL) for the highest level of daily nutrient intake that is likely to pose no risk of adverse health effects to almost all individuals in the general population[,] . . . the IOM does **not** set a UL for trans fatty acid because **any** incremental increase in trans fatty acid intake increases the risk of CHD."[8]

24.    Dr. Julie Louise Gerberding, who served for both of President Bush's two terms as head of the United States Centers for Disease Control and Prevention, summarized these issues:

---

[3] e.g., corn oil, soybean oil, cottonseed oil

[4] e.g., butter, cream, lard, palm oil, coconut oil

[5] Mary Carmichael, *The Skinny on Bad Fat*, Newsweek, Dec. 1, 2003, at 66. *See also* Kim Severson, *Hidden Killer. It's Trans Fat. It's Dangerous. And It's In Food You Eat Every Day*, S.F. CHRON., Jan. 30, 2002.

[6] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

[7] Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease, Proposed Rule, 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[8] *Id.* (emphasis added).

CLASS ACTION COMPLAINT

The scientific rationale for eliminating exposure to artificial trans fatty acids in foods is rock solid. There is no evidence that they provide any health benefit, and they are certainly harmful. These compounds adversely affect both low- and high-density lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at relatively low levels of dietary intake. Gram for gram, trans fats are far more potent than saturated fats in increasing the risk for heart disease, perhaps because they also have pro-inflammatory properties and other adverse effects on vascular endothelium . . . Eliminating exposure to these dangerous fats could have a powerful population impact—potentially protecting 30,000 to 100,000 Americans from death related to heart disease each year.[9]

25.    Dr. Mozaffarian of Harvard Medical School writes in the New England Journal of Medicine:

Given the adverse effects of trans fatty acids on serum lipid levels, systemic inflammation, and possibly other risk factors for cardiovascular disease and the positive associations with the risk of CHD, sudden death from cardiac causes, and possibly diabetes, the potential for harm is clear. The evidence and the magnitude of adverse health effects of trans fatty acids are in fact far stronger on average than those of food contaminants or pesticide residues, which have in some cases received considerable attention.[10]

26.    Given its nature as an artificial chemical not naturally found in any food and the considerable harm that it causes to human health, Dr. Walter Willett, also at Harvard Medical School, finds the most direct analogue of trans fat to be not any natural fat but contaminants such as pesticides. He states that the addition of artificial trans fat to food by companies like ConAgra "is a food safety

---

[9] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-38 (2009)

[10] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENG. J. MED. 1601-13 (2006).

CLASS ACTION COMPLAINT

issue . . . this is actually contamination."[11]

**B.**   **The Artificial Trans Fat in Fleischmann's Causes Cardiovascular Disease**

27.   Trans fat raises the risk of CHD more than any other known consumed substance.[12]

28.   Removing trans fat equivalent to 2% of total calories from the American diet "would prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to 100,000 premature deaths annually."[13]

29.   By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of dangerous heart conditions, including vasodilation, coronary artery disease, and primary cardiac arrest.

30.   In a joint Dietary Guidelines Advisory Committee Report, the Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."[14]

31.   The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."[15]

32.   After a review of literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

> [B]ased on the consistent results across a number of the most persuasive types of
> study designs (i.e., intervention trials and prospective cohort studies) that were
> conducted using a range of test conditions and across different geographical regions
> and populations . . . the available evidence for an adverse relationship between trans

[11] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. (2011).

[12] Mozaffarian, 354 NEW ENG. J. MED. at 1603.

[13] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999).

[14] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[15] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited January 12, 2017).

1   fat intake and CHD risk is strong.[16]

2       33.    The FDA further found "[t]o date, there have been no reports issued by authoritative

3   sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart

4   Disease]."[17] Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol

5   concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk

6   of CHD."[18]

7       34.    This evidence of trans fat's horrific impact on the health of Americans is more than 20

8   years old. Dr. Walter Willett of Harvard Medical School found in 1994:

9           [E]ven the lower estimates from the effects [of PHO] on blood lipids would suggest

10          that more than 30,000 deaths per year may be due to the consumption of partially

11          hydrogenated vegetable fat. Furthermore, the number of attributable cases of

12          nonfatal coronary heart disease will be even larger.[19]

13      35.    By taking blood samples from 179 survivors of cardiac arrest and 285 randomly-selected

14  control patients and comparing the top fifth with the bottom fifth of participants by trans fat intake,

15  another study published in the American Heart Association's *Circulation* found that the largest

16  consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after

17  controlling for a variety of medical and lifestyle risk factors.[20]

18      36.    Australian researchers observed that heart attack patients possess elevated amounts of

19  trans fat in their adipose tissue compared to controls, strongly linking heart disease with long-term

20

21

---

22  [16] Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About

23  *Trans* Fat Nutrition Labeling.

     [17] 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).
24
     [18] *Id.*
25
     [19] W.C. Willett et al.*, Trans Fatty Acids: Are the Effects only Marginal?* 84 AM. J. PUB. HEALTH 722,
26  723 (1994).

27  [20] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac
    Arrest*, 105 CIRCULATION 697, 697-701 (2002).
28

CLASS ACTION COMPLAINT

consumption of trans fat.[21]

37.     While cholesterol dysregulation and pro-inflammatory effects are the best-documented pathways through which trans fat causes heart disease and death, another study isolated an additional method by which trans fat causes atherosclerosis, namely by degrading the function of TGF-β, a protein responsible for preventing the development of atherosclerotic lesions.[22]

38.     TGF-β also functions to suppress cancerous tumors. The same scientists suggest that the degradation of TGF-β may be the reason that trans fat consumption is strongly linked to multiple forms of cancer.[23]

**C.     The Artificial Trans Fat in Fleischmann's Causes Type-2 Diabetes**

39.     Artificial trans fat also causes type-2 diabetes.[24]

40.     In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

41.     Researchers at Northwestern University's medical school found that mice show multiple markers of type-2 diabetes after eating a high trans fat diet for only four weeks.[25]

42.     By the eighth week of the study, mice fed the diet high in trans fat showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress even short-term exposure to artificial trans fat places on the body.[26]

---

[21] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*. 134 J. NUTR. 874, 874-79 (2004).

[22] Chen, C.L. et al., *A mechanism by which dietary trans fats cause atherosclerosis*, J. NUTR. BIOCHEMISTRY 22(7) 649-655 (2011).

[23] *Id.*

[24] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited January 12, 2017).

[25] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

[26] *Id.*

8

43.    A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[27]

**D.    The Artificial Trans Fat in Fleischmann's Causes Breast, Prostate, and Colorectal Cancer**

44.    Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

45.    A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[28]

46.    In a 25-year study of 14,916 American physicians, those in the highest quintile of trans fat consumption had more than double the risk of developing prostate cancer than the doctors in the lowest quintile.[29]

47.    A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[30]

48.    A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[31]

49.    A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the

---

[27] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

[28] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study.* 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

[29] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.*, 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

[30] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[31] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 AM. J. EPIDEMIOLOGY 289, 294 (2008).

etiology and prevention of colorectal cancer."[32]

E.   **The Artificial Trans Fat in Fleischmann's Causes Alzheimer's Disease and Cognitive Decline**

50.   Trans fat causes Alzheimer's Disease and cognitive decline.

51.   In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of . . . trans-unsaturated fats."[33]

52.   The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat."[34]

53.   In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of . . . trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[35]

54.   The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is related to cardiovascular disease risk in individuals with type 2 diabetes. Because insulin, cholesterol, and vascular disease all appear to play important roles in brain aging and cognitive impairments, dietary fat modification may be a particularly effective strategy for preventing cognitive decline, especially in individuals with diabetes."[36] (citations omitted).

55.   Artificial trans fat also damages the brains of those who consume it. A study conducted by UCSD School of Medicine of 1,018 men, mostly younger men, found trans fat consumption to be strongly correlated with impaired memory.[37] The authors of the study, appearing last year in *Circulation*, the American Heart Association's peer-reviewed journal, conclude that "Greater dTFA

---

[32] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

[33] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-99 (2003).

[34] *Id.*

[35] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

[36] *Id.*

[37] Golomb, B. et al., *Trans Fat Consumption is Adversely Linked to Memory in Working-Age Adults*, J. AM. HEART ASSOC. 130:A15572 (2014).

[dietary trans fatty acid] was significantly associated with worse word memory in adults aged 20-45 years, often critical years for career building."

56.     Performing a word memory test, each additional gram per day of trans fat consumed was associated with 0.76 fewer words correctly recalled. The authors suggest trans fat's well-established pro-oxidant effect and its damage to cell energy processes is the pathway by which trans fat consumption damages memory ability. The young men with the highest trans fat consumption scored 12 fewer recalled words on the 104-word test.[38]

**F.     The Artificial Trans Fat in Fleischmann's Causes Organ Damage**

57.     Artificial trans fat damages vital organs, including the heart, by causing chronic systemic inflammation, where the immune system becomes persistently overactive, damages cells, and causes organ dysfunction.[39]

**G.     Artificial Trans Fat Is Been Banned in the United States and Many Other Jurisdictions Because of its Deadly Effects**

58.     In 2008, California became the first state to ban all restaurant food with artificial trans fat. Trans fats now may not be served in California's schools or restaurants in an amount greater than half a gram per serving, nor contain any ingredient with more than this amount.[40]

59.     New York City banned trans fat in restaurants in 2006. Similar laws exist in Philadelphia; Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

60.     A 2004 Danish law restricted all foods to fewer than 2 percent of calories from artificial

---

[38] *Id.*

[39] *See* Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction,* 135 J. NUTR. 562-66 (2005); *see also* Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study,* 79 AM. J. CLIN. NUTR. 969-73 (2004); Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils,* 63 EURO. J. OF CLIN. NUTR. S22-33 (2009); Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure* 80 AM. J. CLIN. NUTR. 1521-25 (2004).

[40] Cal. Educ. Code § 49431.7; Cal. Health & Saf. Code § 114377.

---

11

trans fat. Switzerland made the same restriction in 2008.[41]

61.     After conducting a surveillance study of Denmark's 2004 trans fat ban, researchers concluded the change "did not appreciably affect the quality, cost or availability of food" and did not have "any noticeable effect for the consumers."[42]

62.     Similar bans have been introduced in Austria and Hungary. Brazil, Argentina, Chile, and South Africa have all taken steps to reduce or eliminate artificial trans fats from food.[43]

63.     In 2006, a trans fat task force co-chaired by Health Canada and the Heart and Stroke Foundation of Canada recommended capping trans fat content at 2 percent of calories for tub margarines and spreads and 5 percent for all other foods. On September 30, 2009, British Columbia became the first province to impose these rules on all restaurants, schools, hospitals, and special events.[44]

64.     In its European Food and Nutrition Action Plan 2015-2020, the World Health Organization identified one of its goals as "making the European Region trans fat-free."[45] The European Commission is preparing legislation to ban the use of trans fats in 28 nations in the European Union.[46]

65.     On June 17, 2015, the FDA released its Final Determination Regarding Partially Hydrogenated Oils, in which it declared "PHOs are not GRAS [Generally Recognized as Safe] for any use in human food."[47]

66.     The FDA will begin filing its own enforcement actions against companies that use PHOs

---

[41] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

[42] Mozaffarian, 354 NEW ENG. J. MED. at 1610; *see also* Steen, Stender, *High Levels of Industrially Produced Trans* Fat in Popular Fast Food, 354 NEW ENG. J. MED. 1650, 1652 (2006).

[43] Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. 5567 (2011).

[44] *Province Restricts Trans Fat in B.C.*, British Columbia Ministry of Healthy Living and Sport Press Release (2009), *available at* http://www2.news.gov.bc.ca/news_releases_2005-2009/2009HLS0013-000315.htm (last visited January 26, 2016).

[45] Regional Committee for Europe, *European Food and Nutrition Action Plan 2015-2020*, 64th session.

[46] Basu, J. *European trans fat report 'could lead to ban,'* available at foodnavigator.com/Policy/Trans-fats-ban-in-Europe-possible-after-EU-debate (last visited January 24, 2017).

[47] FDA Final PHO Determination, 80 Fed. Reg. 34650, 34651 (June 17, 2015).

CLASS ACTION COMPLAINT

1  in 2018.

2              **VI.    PLAINTIFFS' PURCHASES OF FLEISCHMANN'S**

3         67.    Plaintiff Marjel McFaddin purchased Fleischmann's during the Class Period defined

4  herein. Specifically, Ms. McFaddin purchased the Original Spread, Original Sticks, and Unsalted Sticks

5  varieties.

6         68.    Ms. McFaddin purchased the Original Sticks variety most frequently.

7         69.    Ms. McFaddin mainly used Fleischmann's for cooking and baking.

8         70.    Ms. McFaddin purchased Fleischmann's sticks approximately nine times annually for

9  many years, and Fleischmann's Original soft spread occasionally for table use.

10        71.    The most frequent location of Ms. McFaddin's purchases of Fleischmann's was the

11  Ralph's located at 1050 N. Western Ave., San Pedro, CA 90732.

12        72.    Plaintiff Mark Beasley purchased Fleischmann's during the Class Period defined herein.

13  Mr. Beasley most often purchased Original and Unsalted stick flavors, as well as Original and Light

14  flavors of Fleischmann's soft tub spread.

15        73.    Mr. Beasley mainly used Fleischmann's for cooking.

16        74.    Mr. Beasley purchased Fleischmann's approximately twelve times annually for many

17  years.

18        75.    The most frequent locations of Mr. Beasley's purchases of Fleischmann's were the

19  Lucky located at 1322 El Camino Real, San Bruno, CA 94066 and the Safeway located at 3350

20  Mission St., San Francisco, CA 94110.

21        76.    Plaintiffs first discovered ConAgra's unlawful acts described herein in January 2017

22  when they learned that Fleischmann's is dangerous and fraudulently marketed.

23        77.    Plaintiffs, in the exercise of reasonable diligence, could not have discovered earlier

24  ConAgra's unlawful acts described herein because the full dangers of artificial trans fats were known to

25  Defendant, but not to them, throughout the Class Period defined herein. Plaintiffs are not nutritionists,

26  food experts, or food scientists, but rather lay consumers who did not have the specialized human

27  nutrition knowledge of ConAgra. Even today the nature and extensive utilization of artificial trans

28  fats—including that they necessarily exist where partially hydrogenated oil is used an ingredient in a

food product—is generally unknown to the average consumer. When purchasing Fleischmann's during the Class Period, Plaintiffs read and relied on various health and wellness claims appearing on its packaging (as further described herein), which individually and especially in the context of its packaging as a whole, misleadingly implied that Fleischmann's is healthy.

78.    Because Plaintiffs expected these statements to be true and honest when they are in fact false and misleading, they did not receive the benefits of their purchases.

### VII.    SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DECEPTIVE ACTS

79.    During the Class Period, Fleischmann's was made with PHO yet contained deceptive health and wellness claims.

80.    Exemplars of front and back label of Fleischmann's are as follows:







Twin Tub                    1lb Tub





15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28









16





81.     Fleishmann's contains the following health claims:

82.     **Misleading "maintain your healthy lifestyle" claim:** During the Class Period, ConAgra marketed Fleishmann's with the phrase, "The delicious taste of Fleishmann's enhances your favorite foods while maintaining your healthy lifestyle."

83.     This language was part of an intentional campaign to deceptively market Fleishmann's as healthful.

84.     **Misleading "70% Less Saturated Fat" claim:** During the Class Period, ConAgra marketed Fleishmann's with the phrase "70% Less Saturated Fat" than butter in large script across the front of the package.

85.     This language was part of an intentional campaign to deceptively market Fleishmann's

17

as healthful.

86. ConAgra's conduct is especially egregious because while butter contains a small amount of harmless dietary cholesterol, it does not contain any artificial trans fat, a fact that is relevant but deceptively omitted.

87. **Misleading "100% Less Cholesterol" claim:** During the Class Period, Defendant marketed Fleischmann's with the phrase "100% Less Cholesterol" than butter in large script across the front of the package.

88. This language was part of an intentional campaign to deceptively market Fleischmann's as healthful.

89. ConAgra's conduct is especially egregious because butter does not contain any artificial trans fat, which raises "bad (LDL) cholesterol and lower[s] . . . good (HDL) cholesterol levels" thereby "increase[ing] your risk of developing heart disease."[48]

90. **Misleading "No Trans Fat" claim:** During the Class Period, Defendant marketed Fleischmann's with the phrase "No Trans Fat" in large script across the front of the package. Because Fleischmann's contains PHO, it necessarily contains trans fat.

91. "No Trans Fat" is further an unauthorized nutrient content claim.

92. This language was part of an intentional campaign to deceptively market Fleischmann's as healthful.

93. **Misleading "0g Trans Fat" claim:** During the Class Period, Defendant marketed Fleischmann's with the phrase "0g Trans Fat" in large script across the front of the package. Because Fleischmann's contains PHO, it necessarily contains trans fat. It is further an unauthorized nutrient content claim.

94. This language was part of an intentional campaign to deceptively market Fleischmann's as healthful.

95. Consumers are generally willing to pay more for foods they perceive as being healthy, or

---

[48] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited January 12, 2017).

healthier than alternatives. Nielsen's 2015 Global Health & Wellness Survey, for instance, found that 80% of those polled are willing to pay more for healthier foods.[49]

96.    ConAgra is well aware of consumer preference for healthful food and employed a strategic marketing campaign intended to convince consumers that Fleischmann's is healthy when it contained dangerous levels of artificial trans fat.

## VIII.  FLEISCHMANN'S UNLAWFULLY OMITTED ITS ARTIFICIAL FLAVOR

97.    In addition to its misleading labeling with respect to trans fats, Fleischmann's is further unlawfully mislabeled in that it does not properly disclose added artificial butter flavor as required by FDA regulations and California law.

98.    Fleischmann's labeling, packaging, and marketing include explicit comparisons of Fleischmann's to natural butter, as well as pictorial representations of it in a context where butter is normally used.

99.    ConAgra represents its spread as a "butter alternative[]" and advertises it with slogans such as, "Savor the delicious, buttery flavor you love. . . ."

100.    These comparisons and direct representations establish that the characterizing flavor of Fleischmann's is butter.    This is the characterizing flavor that Fleischmann's communicates to consumers.

101.    Fleischmann's ingredients include both natural and artificial flavors which simulate, resemble, or reinforce the characterizing butter flavor.

102.    21 C.F.R. 101.22(i) requires that if "the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction . . . or other means . . . such flavor shall be considered the characterizing flavor and shall be declared." If the food contains artificial flavor, "the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name(s) of the characterizing flavor . . . and the name of the characterizing flavor shall be accompanied by the word(s) 'artificial' or 'artificially flavored.'" 21 C.F.R. 101.22(i)(2).

---

[49] Neilsen Global Health and Wellness Survey (January 2015), p.11.

103. Because Fleischmann's makes clear representations that it is intended to replace butter and that its characterizing flavor is butter but does not include FDA-required labeling regarding this characterizing flavor on the principal display panel, it is misbranded under FDA regulations and violates federal and state food label regulations and California's UCL.

## IX.    FLEISCHMANN'S UNNECESSARILY CONTAINED PHO AND ARTIFICIAL TRANS FAT

104. ConAgra's use of PHO in Fleischmann's was always unnecessary. There were many safe substitutes for PHO and artificial trans fat. Indeed, both ConAgra and its competitors used these safe substitutes, such as palm oil, during the Class Period.

105. During the Class period, most other manufacturers of competing spread products responsibly decided to refrain from using trans fat. In early 2016, these brands sold in the United States included I Can't Believe It's Not Butter!, Country Crock, Promise, Land O'Lakes, and Smart Balance, including specific varieties as identified in Appendix A hereto.

106. Although commercially viable alternative formulations and substitutes for PHO were and are available, ConAgra elected not to use them in Fleischmann's in order to increase its profits at the expense of consumers' health.

## X.    DEFENDANT'S PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW

107. ConAgra's practices as described herein are "unfair" within the meaning of the California Unfair Competition Law because its conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the utility of this conduct to ConAgra does not outweigh the gravity of the harm to ConAgra's victims.

108. Plaintiffs' claims for unfair business practices are independent of their claims for false advertising. Even absent Fleischmann's false advertising, the sale of Fleischmann's violated the UCL and implied warranty of merchantability.

109. In particular, while ConAgra's use of PHO in Fleischmann's may have had some utility in the form of higher profits than if it used safer PHO substitutes, this utility is small and far outweighed by the gravity of the serious health harm Defendant inflicts upon consumers.

20

110.    ConAgra's conduct also injured competing manufacturers of products that did not engage in its unfair behavior, especially given its large market share and limited refrigerated retail shelf space.

111.    Moreover, ConAgra's practices violate public policy as declared by specific constitutional, statutory, or regulatory provisions, including the California Health & Safety Code § 114377 and California Education Code § 49431.7.

112.    ConAgra's actions also violate public policy by causing the United States and California to pay—via Medicare, Medicaid, Affordable Care Act Exchange subsidies, veterans' health programs, public employee and retiree health insurance—for treatment of trans fat-related illnesses.

113.    Further, the injury to consumers from ConAgra's practices is substantial, not outweighed by benefits to consumers or competition, and not an injury consumers themselves could reasonably have avoided.

## XI.    DEFENDANT'S PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING OF THE CALIFORNIA UNFAIR COMPETITION LAW

114.    ConAgra's practices as described herein are "unlawful" within the meaning of the California Unfair Competition Law because PHO was never Generally Recognized as Safe ("GRAS") during the Class Period. Therefore, ConAgra's use of PHO renders its products adulterated within the meaning of 21 U.S.C. § 342(a)(2)(C).

115.    The PHO used in Fleischmann's appears nowhere on the FDA's list of the hundreds of substances it considers GRAS.[50]

116.    PHO also fails to meet the fundamental requirement for GRAS status—that the substance is safe. In fact, the FDA has explicitly recognized that there is no safe level of artificial trans fat consumption.

117.    Under the Food Additives Amendment of 1958, which amended the FDCA, all food additives are unsafe unless they (1) fall within a specified exemption to the statute's definition of food additive, or (2) their use is pursuant to FDA approval. Because the PHO used in Fleischmann's does not

---

[50] *See* 21 C.F.R. §§ 181, 182, 184 and 186.

meet either of these exceptions, they are, and long have been, unsafe, and unlawful for use in food.

118.   ConAgra's use of PHO in Fleischmann's thus constitutes adulteration under 21 U.S.C. § 342 and Cal. Health & Safety Code § 110545.

119.   On November 8, 2013, the FDA made its initial tentative determination that PHO is unsafe, and therefore is not GRAS.[51]

120.   On June 17, 2015, after extensive public comment, the FDA determined trans fat is not GRAS.[52]

121.   ConAgra's "No Trans Fat" and "0g Trans Fat" claims also constitute violations of 21 C.F.R. 101.62, which does not provide authorization for such claims relating to a product's trans fat content outside of the nutrition panel.

122.   Further, ConAgra's use of the phrase, "The delicious taste of Fleischmann's enhances your favorite foods while maintaining your healthy lifestyle," violates 21.C.F.R. 101.65 because Fleischmann's does not meet § 101.65's requirements for making such a claim.

123.   At no point during the class period was there a scientific consensus that PHO was safe. Indeed, for more than two decades, the scientific consensus has been that it is unsafe.

## XII.   RELIANCE AND INJURY

124.   When purchasing Fleischmann's, Plaintiffs were seeking products of particular qualities, including products that did not negatively affect blood cholesterol levels or the health of their cardiovascular system, and products made with safe, lawful ingredients.

125.   Plaintiffs read and relied on, for their Fleischmann's purchases, the product's packaging and the health and wellness message it conveyed, which was a substantial factor in each of their purchases.

126.   Specifically, Plaintiffs relied on statements that Fleischmann's would allow them to "maintain" a "healthy lifestyle" and that the various claims that Fleischmann's was healthier than butter were fair comparisons of the two products.

---

[51] 78 Fed. Reg. 67169 (November 8, 2013).

[52] 80 Fed. Reg. 34650 (June 17, 2015).

127.    Plaintiffs were further injured by ConAgra's omission of information that would have been important to their purchasing decisions.

128.    Plaintiffs purchased Fleischmann's believing it had the qualities they sought based on the product's deceptive labeling and the natural assumption that food sold in stores by large companies would not have unsafe and unlawful ingredients.

129.    Instead, they were actually unsatisfactory to Plaintiffs for the reasons described herein.

130.    Fleischmann's costs more than similar products without false and misleading labeling, and would have cost less and demanded less in the marketplace, absent ConAgra's false and misleading statements and material omissions. Plaintiffs lost money as a result of ConAgra's conduct because they purchased products that were detrimental to their health and were unfairly offered for sale in violation of federal and California law.

131.    Plaintiffs purchased Fleischmann's instead of competing products based on the false statements and misrepresentations described herein.

132.    Plaintiffs suffered physical injury when they repeatedly consumed Fleischmann's because consuming artificial trans fat in *any* quantity, including the quantity they actually consumed, inflames and damages vital organs and substantially increases the risk of heart disease, diabetes, cancer, and death.

133.    Fleischmann's contains an unsafe amount of artificial trans fat which renders it unfit for human consumption.

## XIII.    DELAYED DISCOVERY

134.     Plaintiffs did not discover that ConAgra's behavior was unfair and unlawful and that ConAgra's labeling was false, deceptive, or misleading until January 2017 when they learned the true extent of the dangers of consuming trans fat. Until this time, they lacked the knowledge regarding the facts of their claims against ConAgra.

135.    Plaintiffs are reasonably diligent consumers who exercised reasonable diligence in their purchase, use, and consumption of Fleischmann's. Nevertheless, they would not have been able to discover ConAgra's deceptive practices and lacked the means to discover them given that, like nearly all consumers, they are not experts on nutrition and do not typically read or have ready access to

scholarly journals such as The Journal of Nutrition,[53] The European Journal of Clinical Nutrition,[54] and The New England Journal of Medicine,[55] where the scientific evidence of artificial trans fat's dangers was published. Furthermore, ConAgra's labeling practices actively impeded Plaintiffs' and Class members' abilities to discover the dangerous effects of Fleischmann's throughout the Class Period.

## XIV.    CLASS ACTION ALLEGATIONS

136.    Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), excluding ConAgra's officers, directors, and employees, and the Court, its officers and their families.

137.    The Class is defined as follows:

### PHO Class (Causes of Action One to Three)

All persons who purchased in the United States, on or after January 1, 2008, for household or personal use, Fleischmann's products containing partially hydrogenated oil.

### Misleading Claims Subclass (All Causes of Action)

All persons who purchased in the United States, on or after January 1, 2008, for household or personal use, Fleischmann's products in packaging containing one or more of the following phrases: "The delicious taste of Fleischmann's enhances your favorite foods while maintaining your healthy lifestyle," "70% less saturated fat," or "100% less cholesterol" containing partially hydrogenated oil.

138.    Questions of law and fact common to Plaintiffs and the Class include:

a.    Whether ConAgra communicated a health and wellness message through Fleischmann's packaging;

---

[53] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*, 134 J. NUTR. 874, 874-79 (2004).

[54] A. Tavani et al., *Margarine Intake and Risk of Nonfatal Acute Myocardial Infarction in Italian Women*, 51 EUR. J. CLIN. NUTR. 30–32 (1997) (estimating a 50 percent greater risk of heart attack in women with high consumption of margarine, an association "independent of body mass index, history of hypertension and hyperlipidemia").

[55] Mozaffarian, 354 NEW ENG. J. MED. at 1611 ("10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat").

b.    Whether that message was material, or likely to be material, to a reasonable consumer;

c.    Whether that message was false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

d.    Whether ConAgra's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

e.    Whether the slight utility Defendant realizes as a result of its conduct outweighs the gravity of the harm the conduct causes to its victims;

f.    Whether ConAgra's conduct violates public policy as declared by specific constitutional, statutory, or regulatory provisions;

g.    Whether the injury to consumers from Defendant's practices is substantial;

h.    Whether Defendant fraudulently omitted material information in advertising Fleischmann's as healthy;

i.    Whether the class is entitled to restitution, rescission, attorneys' fees and costs, injunctive, and/or any other relief;

j.    Whether the statute of limitations should be tolled on behalf of the Class;

k.    Whether ConAgra's conduct constitutes violations of the California's False Advertising Law;

l.    Whether ConAgra's conduct was immoral, unscrupulous, or offensive of public policy because Defendant advertised Fleischmann's to people deliberately seeking a healthy option despite knowing of the dangers from its artificial trans fat content;

m.    Whether ConAgra's conduct constitutes a violation of the California Consumer Legal Remedies Act;

n.    Whether Defendant's conduct constitutes a violation of the unlawful prong of California's Unfair Competition Law;

o.    Whether members of the Class are entitled to restitution and, if so, the

25

1    correct measure of restitution;

2    p.    Whether members of the Class are entitled to an injunction and, if so, its

3          terms; and

4    q.    Whether members of the Class are entitled to any further relief.

5    139.    By purchasing Fleischmann's, all Class members were subjected to the same wrongful

6    conduct.

7    140.    Plaintiffs' claims are typical of the Class' claims.

8    141.    All Class members were subjected to the same economic harm when they purchased

9    Fleischmann's and suffered economic injury.

10    142.    Plaintiffs will fairly and adequately protect the interests of the Class, have no interests

11    that are incompatible with the interests of the Class, and have retained counsel competent and

12    experienced in class litigation.

13    143.    The Class is sufficiently numerous, as it includes thousands of individuals who

14    purchased Fleischmann's throughout the United States during the Class Period.

15    144.    Class representation is superior to other options for the resolution of the controversy.

16    The relief sought for each Class member is small, as little as two dollars for some Class members.

17    Absent the availability of class action procedures, it would be infeasible for Class members to redress

18    the wrongs done to them.

19    145.    ConAgra has acted on grounds applicable to the Class, thereby making final injunctive

20    relief or declaratory relief appropriate concerning the Class as a whole.

21    146.    Questions of law and fact common to the Class predominate over any questions

22    affecting only individual members.

23    147.    Class treatment is appropriate under Fed. R. Civ. P. 23(a) and both Fed. R. Civ. P.

24    23(b)(2) and 23(b)(3).

25

26

27

28

CLASS ACTION COMPLAINT

# XV.  CAUSES OF ACTION

## First Cause of Action

### California Unfair Competition Law (Unfair Prong)

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

148.    In this and every cause of action, Plaintiffs reallege and incorporate by reference each and every allegation contained elsewhere in this Complaint, as if fully set forth herein.

149.    Cal. Bus. & Prof. Code §§ 17200 *et seq.* prohibits any "unlawful, unfair or fraudulent business act or practice."

150.    The business practices and omissions of ConAgra as alleged herein constitute "unfair" business acts and practices in that ConAgra's conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct does not outweigh the gravity of the harm to consumers.

151.    Further, ConAgra's practices are unfair because they violate public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA, California Health & Safety Code, and California Education Code.

152.    Further, ConAgra's practices are unfair because the injury to consumers from ConAgra's practices is substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided or should be obligated to avoid.

153.    Plaintiffs seek an order for the disgorgement and restitution of all revenue received by ConAgra from the sale of Fleischmann's.

## Second Cause of Action

### Breach of Implied Warranty of Merchantability

154.    ConAgra, through its acts and omissions set forth herein, in the sale, marketing and promotion of Fleischmann's, made representations to Plaintiffs and the Class that Fleischmann's was safe to consume.

155.    Plaintiffs and the Class bought Fleischmann's manufactured, advertised, and sold by Defendant, as described herein.

156.   ConAgra is a merchant with respect to the goods of this kind which were sold to Plaintiffs and the Class, and there was in the sale to Plaintiffs and other members of the Class an implied warranty that those goods were merchantable.

157.   ConAgra breached that implied warranty, however, in that Fleischmann's is not fit for their ordinary purpose and do not conform with the representations on their labels, as set forth in detail herein.

158.   As an actual and proximate result of ConAgra's conduct, Plaintiffs and the Class did not receive goods as impliedly warranted by Defendant to be merchantable in that they did not conform to the promises and affirmations made on the container or label of the goods.

159.   Plaintiffs and the Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of Fleischmann's purchase price.

### Third Cause of Action

### California Unfair Competition Law (Unlawful Prong)

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

160.   ConAgra has made and distributed, in interstate commerce and in this District, products that make false and misleading statements of fact regarding its content. Fleischmann's was placed into interstate commerce by Defendant and sold throughout the United States.

161.   Cal. Bus. & Prof. Code §§ 17200 *et seq.* prohibits any "unlawful, unfair or fraudulent business act or practice."

162.   The acts, omissions, misrepresentations, practices, and non-disclosures of ConAgra as alleged herein constitute "unlawful" business acts and practices in that Defendant's conduct violates the California False Advertising Law, and the California Consumer Legal Remedies Act, as alleged herein.

163.   ConAgra's conduct is further "unlawful" because it violates § 43(a) the Lanham Act, 15 U.S.C. § 1125(a), in that Defendant's advertising constitutes false statements of fact in interstate commerce about its own and other products, which were material in that they were likely to influence consumers' purchasing decisions, and which had a tendency to deceive, or actually deceived a substantial segment of Defendant's audience, resulting in injury.

164.    ConAgra's conduct is further "unlawful" because it violates the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, (1) 21 U.S.C. § 343(a), which deems food misbranded when the label contains a statement that is "false or misleading in any particular," (2) 21 C.F.R. 101.13(i)(3), which bars nutrient content claims that are "false or misleading in any respect," (3) 21 C.F.R. 101.14 requiring claims to be "complete, truthful, and not misleading," and which "enables the public to comprehend the information" and (4) 21 U.S.C. § 343(r)(3)(C) requiring claims to present "a balanced representation of the scientific literature relating to the relationship between a nutrient and a disease or health-related condition to which the claim refers," be "stated in a manner so that the claim is an accurate representation of the authoritative statement," be in compliance with "section 201(n)", and the product "not [to] contain . . . any nutrient in an amount which increases to persons in the general population the risk of a disease or health-related condition which is diet-related."

165.    ConAgra further violates the FDCA's implementing regulation, 21 C.F.R. 1.21, because Fleischmann's packaging fails to reveal material facts, namely the dangers of PHO described in detail herein, "in light of other representations," namely the specific statements described herein as misleading. In particular, its comparison of Fleischmann's and butter omitted the material fact that butter is free of PHO, while Fleischmann's contains it in dangerous amounts.

166.    ConAgra's conduct is "unlawful" because it violates the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, the Food Additives Amendment of 1958, which deems a food additive unsafe unless it has met one of two exceptions, neither of which the PHO used in the Fleischmann's has met. 21 U.S.C. §§ 348, 342.

167.    ConAgra's conduct also violates the following portions of the FDCA:

- 21 U.S.C. § 331(a), prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";

- 21 U.S.C. § 331(b), prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";

- 21 U.S.C. § 331(c), prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise";

- 21 U.S.C. § 331(k), prohibiting "the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded";

- 21 U.S.C. § 342(a), which deems any food adulterated if it "contains any poisonous or deleterious substance which may render it injurious to health";

- 21 U.S.C. § 348, prohibiting the use of any food additive unless it has been deemed GRAS;

168.    ConAgra's conduct violates 21 C.F.R. 101.22 because it fails to label its product to reflect the characterizing flavor of butter despite making "direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction . . . or other means."

169.    Fleischmann's also fails to properly label its use of artificial flavors to simulate, resemble or reinforce the characterizing flavor.

170.    ConAgra's conduct further violates the California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code § 110660, which deems food products "misbranded" if their labeling is "false or misleading in any particular," and Health & Safety Code § 110670, which bars nutrient content claims voluntarily placed on the front of a product label that fail to comply with the federal regulation for nutrient content claims (i.e., "may not be false or misleading in any respect"). ConAgra's conduct also violates the following sections of the Sherman Law:

- § 110100, adopting all FDA regulations as state regulations;

- § 110290, "In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of

30

customary use of the food . . . shall also be considered.";

- § 110390, "It is unlawful for any person to disseminate any false advertisement of any food . . . . An advertisement is false if it is false or misleading in any particular.";

- § 110395, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.";

- § 110398, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

- § 110400, "It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . .";

- § 110670, "Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto.";

- § 110680, "Any food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4 (commencing with Section 110290).";

- § 110705, "Any food is misbranded if any word, statement, or other information required pursuant to this part to appear on the label or labeling is not prominently placed upon the label or labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.";

- § 110760 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.");

- § 110765, "It is unlawful for any person to misbrand any food."; and

- § 110770, "It is unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food."

171.    Additionally, ConAgra's conduct violates 21 C.F.R. 101.62 because the "No Trans Fat" and "0g Trans Fat" claims used on Fleischmann's during the Class Period constitute unauthorized nutrient content claims within the meaning of § 101.62.

172.   In addition, ConAgra's use of the phrase, "The delicious taste of Fleischmann's enhances your favorite foods while maintaining your healthy lifestyle," on Fleischmann's violates 21 C.F.R. 101.65 because it advertises Fleischmann's as 'healthy,' but Fleischmann's does not meet the requirements for making such a claim.

173.   To "use the term 'healthy' or related terms (e.g., 'health,' 'healthful,' 'healthfully,' 'healthfulness,' 'healthier,' 'healthiest,' 'healthily,' and 'healthiness')" foods must satisfy specific "conditions for fat, saturated fat, cholesterol, and other nutrients." 21 C.F.R 101.65(d)(2).

174.   The Fleischmann's products at issue are "not specifically listed" in the table contained in 21 C.F.R 101.65(d)(2)(i), and therefore are governed by section (F) of the table. *See* 21 C.F.R. 101.65(d)(2)(i)(F).

175.   Under 21 C.F.R. 101.65(d)(2)(i)(F), to use a "healthy" term, a food must (1) be "Low fat as defined in § 101.62(b)(2)," (2) be "Low saturated fat as defined in § 101.62(c)(2)," and (3) contain "At least 10 percent of the RDI [recommended daily intake] or the DRV [dietary reference values] per RACC [reference amount customarily consumed] of one or more of vitamin A, vitamin C, calcium, iron, protein or fiber." *See* 21 C.F.R. 101.65(d)(2)(i)(F) (incorporating by reference total fat requirement, 21 C.F.R. 101.62(b)(2), and saturated fat requirement, 21 C.F.R. 101.62(c)(2)). In addition, the food must comply "with the definition and declaration requirements in this part 101 for any specific nutrient content claim on the label or in labeling." 21 C.F.R. 101.65(d)(2)(iii).

176.   Section 101.62(b)(2)(i)(B) provides the applicable definition of "low fat" for Fleischmann's because it has RACCs (reference amounts customarily consumed) and labeled servings of less than 30 grams.

177.   Fleischmann's Unsalted both contains 9 grams of total fat per RACC or labeled serving, and 32.14 grams of total fat per 50 grams. Thus, Fleischmann's does not meet the total fat requirement in section 101.65(d)(2)(i)(F), and as a result, their use of a "healthy" term renders it misbranded.

178.   Further, Fleischmann's does not contain "at least 10 percent of the RDI or the DRV per RACC of one or more of vitamin A, vitamin C, calcium, iron, protein or fiber," 21 C.F.R. 101.65(d)(2)(i)(F), and as a result, ConAgra's use of a "healthy" term renders Fleischmann's misbranded under section 101.62(b)(2)(i)(B), a food is low fat only if it "contains 3 g or less of fat per

32

reference amount customarily consumed and per 50 g of food."

179.    Finally, Fleischmann's, as explained above, fails to comply "with the definition and declaration requirements in this part 101 for any specific nutrient content claim on the label or in labeling," 21 C.F.R. 101.65(d)(2)(iii), further rendering it misbranded.

180.    In sum, Fleischmann's bears an unauthorized claim that the products are healthy. Fleischmann's does not meet the clear and specific criteria the FDA (and by extension, California) requires for using the term healthy (and variations) to describe a food or supplement.

181.    Defendant's use of the term healthy (and variations) to describe Fleischmann's not only violates 21 C.F.R. 101.65 and renders the products misbranded, but also misleads consumers regarding the nature of the oils, in the specific manner the regulations are intended to prevent.

182.    All of the challenged labeling statements made by ConAgra thus constitute violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

183.    ConAgra leveraged its deception to induce Plaintiffs and members of the Class to purchase products that were of lesser value and quality than advertised.

184.    Plaintiffs suffered injury in fact and lost money or property as a result of ConAgra's deceptive advertising: they were denied the benefit of the bargain when they decided to purchase Fleischmann's over competing products that are less expensive and/or contain no artificial trans fat.

185.    Defendant's deceptive advertising allowed it to sell more units of Fleischmann's than it would have otherwise, and at a higher price.

## Fourth Cause of Action

### California Unfair Competition Law (Fraudulent Prong)

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

186.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "fraudulent" business acts and practices in that Defendant's conduct has a likelihood, capacity or tendency to deceive Plaintiff, the Classes, and the general public.

**Fifth Cause of Action**

**California Unfair Competition Law (Unfair Prong)**

**Cal. Bus. & Prof. Code §§ 17200 *et seq.***

187.    Cal. Bus. & Prof. Code §§ 17200 *et seq.* prohibits any "unlawful, unfair or fraudulent business act or practice."

188.    Plaintiffs suffered injury in fact and lost money or property as a result of ConAgra's deceptive advertising: they were denied the benefit of the bargain when they decided to purchase Fleischmann's over competing products, which are less expensive and/or contain no artificial trans fat.

189.    Defendant's deceptive advertising allowed it to sell more units of Fleischmann's, and at a higher price.

190.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute "unfair" business acts and practices because ConAgra's conduct is:

   a.   immoral, unethical, unscrupulous, and offends public policy;

   b.   the gravity of ConAgra's conduct outweighs any conceivable benefit of such conduct; and

   c.   the injury to consumers caused by Defendant's conduct is substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.

191.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; to commence a corrective advertising campaign; and restitution of all monies from the sale of Fleischmann's.

**Sixth Cause of Action**

**California False Advertising Law**

**Cal. Bus. & Prof. Code §§ 17500 *et seq.***

192.    In violation of Cal. Bus. & Prof. Code §§ 17500 *et seq.*, the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of Fleischmann's without the knowledge that they were dangerous.

193.    Defendant knew and reasonably should have known that the labels on Fleischmann's were untrue and misleading.

194.    As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

## Seventh Cause of Action

### California Consumer Legal Remedies Act

### Cal. Civ. Code §§ 1750 *et seq.*

195.    Defendant's policies, acts and practices were designed to, and did, result in the purchase and use of Fleischmann's primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

   a.    § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

   b.    § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

   c.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

   d.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

196.    As a result, Plaintiffs and the Class have suffered irreparable harm and are entitled to injunctive relief. Plaintiffs seek no damages by way of their CLRA claim, but may amend their complaint to do so.

197.    In compliance with Civ. Code § 1782, Plaintiffs sent Defendant written notice of their claims. Plaintiffs notified Defendant in writing by certified mail of the particular violations of § 1770 of the Act as to Fleischmann's and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

198.    Defendant received Plaintiffs' written notice on January 17, 2017.

**Eighth Cause of Action**

**Breach of Express Warranty**

200.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

201.    During the class period, Defendant made written representations to the public, including Plaintiffs, by its advertising and packaging that Fleischmann's contains "No Trans Fat" and allows people to "maintain[] [their] healthy lifestyle."

202.    These promises printed on the label became part of the basis of the bargain between the parties and thus constituted an express warranty.

203.    Thereon, Defendant sold the goods to Plaintiffs and other consumers who bought the goods from Defendant.

204.    However, Defendant breached this express warranty in that Fleischmann's contains PHO, a toxic substance known to increase the risk of coronary heart disease, cancer, Alzheimer's disease, type-2 diabetes, stroke, and other ailments.

205.    As a result of this breach, Plaintiffs and other consumers in fact did not receive goods as warranted by Defendant.

206.    As a proximate result of this breach of warranty by Defendant, Plaintiffs and other consumers have been damaged in an amount to be determined at trial.

## XVI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Defendant as follows:

A.    An order confirming that this class action is properly maintainable as a nationwide class action as defined above, appointing Plaintiffs Marjel McFaddin and Mark Beasley and their undersigned counsel to represent the Class, and requiring Defendant to bear the cost of class notice;

B.    An order requiring ConAgra to pay restitution to Plaintiffs and class members in the amount of $25 million, or such greater amount to be determined at trial;

C.    An order requiring Defendant to disgorge any benefits received from Plaintiffs and its

36

unjust enrichment realized as a result of its improper and misleading advertising and marketing of Fleischmann's;

D.    An Order declaring the conduct complained of herein violates the Unfair Competition Law;

E.    An Order requiring Defendant to pay restitution to the Class so that they may be restored any money which was acquired by means of any deceptive and fraudulent acts;

F.    An award of prejudgment and post judgment interest;

G.    An award of attorneys' fees and costs;

H.    An award of damages, but not under the CLRA; and

I.    Such other and further relief as this Court may deem just, equitable or proper.

## XVII.    <u>JURY DEMAND</u>

Plaintiffs request a trial by jury.

DATED: January 25, 2017                    Respectfully Submitted,


                                           /s/ Gregory S. Weston
                                           **THE WESTON FIRM**
                                           GREGORY S. WESTON
                                           ANDREW C. HAMILTON
                                           1405 Morena Blvd., Suite 201
                                           San Diego, CA 92110
                                           Telephone:    (619) 798-2006
                                           Facsimile:    (313) 293-7071

                                           ***Counsel for Plaintiffs***

## XVIII.    APPENDIX A: COMPETING TRANS FAT FREE PRODUCTS

- Each of the following vegetable oil spread and sticks distributed by Unilever:

    - Country Crock Original Spread

    - Country Crock Calcium Plus Vitamin D Spread

    - Country Crock Churn Style Spread

    - Country Crock Light Spread

    - Country Crock Spreadable Sticks

    - Promise Active Spread

    - Promise Buttery Spread

    - Promise Light Spread

    - I Can't Believe It's Not Butter Original Spread

    - I Can't Believe It's Not Butter Light Spread

    - I Can't Believe It's Not Butter Olive Oil Spread

    - I Can't Believe It's Not Butter Deliciously Simple Spread

    - I Can't Believe It's Not Butter All-Purpose Sticks

- Each of the following vegetable oil spreads and sticks distributed by Land O'Lakes:

    - Fresh Buttery Taste Spread Tub

    - Fresh Buttery Taste Spread with Olive Oil Tub

- Each of the following vegetable oil spreads distributed by Boulder Brands USA, Inc.:

    - Smart Balance Original

    - Smart Balance Light with Flaxseed Oil

    - Smart Balance Omega-3

    - Smart Balance Light Omega-3

    - Smart Balance EVOO

    - Smart Balance Light with EVOO

    - Smart Balance Organic

    - Smart Balance Low Sodium

38